UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re:

NORMAN L. WOERNER,                                Case No. 09-13918-MAM-11

    *Debtor*.

VISION BANK,

    *Plaintiff*,

v.                                                          Adv. Proc. No. 09-1124

NORMAN L. WOERNER,

    *Defendant*.

ORDER DECLARING DEBT OF NORMAN L. WOERNER TO VISION BANK
DISCHARGEABLE IN BANKRUPTCY

Richard M. Gaal, Attorney for Plaintiff, Mobile, Alabama
Irvin Grodsky, Attorney for Defendant, Mobile, Alabama

This case is before the Court for the trial on the merits of the complaint of Vision Bank against Norman L. Woerner for a determination of the dischargeability of Defendant's debt to the Bank pursuant to 11 U.S.C. § 523(a)(2)(B). This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). For the reasons indicated below, the Court concludes that the debt of Norman L. Woerner, defendant, to Vision Bank, plaintiff, is dischargeable. [1]

---

[1] Some facts are contained in the Facts section. Others are stated in the Law section. All are findings of fact utilized by the Court in its decision.

# FACTS[2]

Norman L. Woerner ("Woerner") filed a chapter 7 bankruptcy case in this Court on August 26, 2009. At the time of filing he had an interest in numerous business enterprises. Vision Bank (the "Bank") sued Norman Woerner as a result of a loan made to one of the entities in which Norman Woerner had an interest (the "Woerner Entities" or "Woerner Enterprises").

Total Vision of the Gulf States was a corporation that intended to install boxes in hotel rooms and condominiums that would provide video on demand and internet services. In January 2004, Vision Bank loaned Total Vision $5,000,000. The loan was paid down to about $4.6 million by February, 2006, but was a troubled loan. The company was not profitable and needed an additional cash infusion according to the Bank's internal memos. By August 8, 2006, Norman Woerner was acquiring a 57% interest in the company by purchasing the majority stockholder's interest for $2,000,000 and assumption of Total Vision's debt. Norman Woerner put $2,000,000 of his own money into the business that was not proceeds of the loan from Vision Bank.

Total Vision determined it needed an additional $1,500,000 credit line to purchase new equipment for installation in rooms to make the company profitable. It asked Vision Bank to fund this line, in addition to the prior loan that had been paid down to $4.2 million by August 2006. The Bank agreed to fund the additional line of credit if Wood Treaters, LLC and Norman Woerner would guarantee the debt. Wood Treaters, LLC is a Florida limited liability company of which Norman Woerner and his family owned a controlling interest. The bank memo stated that "[t]he primary source of repayment for the credit will be the sale of the equipment purchased with the line . . . The secondary source of repayment will be the cash flow of Wood

---

[2] Testimony that was conditionally received at the trial was not necessary to the Court's conclusions. Therefore, receipt of the evidence is denied.

Treaters, LLC." (Defendant's Ex. No. 22)  The Bank considered the Wood Treaters' guarantee to be an integral part of the loan.  On August 10, 2006, Vision Bank sent a proposed commitment letter to Woerner.  Woerner accepted the commitment on August 15, 2006.  The loan closed on September 6, 2006.

To get the loan with Vision Bank, Norman Woerner presented financial information about his business interests and his personal finances to the Bank.  The parties agree that Woerner produced:

1. Limited Liability Company Operating Agreement of Wood Treaters, LLC
2. Wood Treaters, LLC Balance Sheet and Income Statement as of 7/31/06
3. Norman and Catherine Woerner Statement of Financial Condition as of 6/30/06
4. Consolidated Profit and Loss and Balance Sheet as of 8/31/06 for entities including Woerner Distributors, Wood Treaters, Woerner Displays, Inc., Everstone Pavers, and Norman Woerner Management (among others) (the "Woerner Entities" or the "Woerner Enterprises")
5. Debt Schedules of the Woerner Entities as of 8/3 or 8/4/06
6. UCC-1 Financing Statement for Wood Treaters, LLC to AmSouth Bank filed 7/11/06 indicating Wood Treaters granted a lien to AmSouth that covered all inventory and general intangibles of Wood Treaters
7. UCC-1 Financing Statement for Wood Treaters, LLC to AmSouth Bank filed 7/11/06 indicating Wood Treaters granted a lien to AmSouth that covered all accounts of Wood Treaters
8. UCC-1 Financing Statement for Wood Treaters, LLC to AmSouth Bank filed 7/11/06 indicating Wood Treaters granted a lien to AmSouth that covered all inventory and general intangibles of Wood Treaters
9. UCC-1 Financing Statement for Wood Treaters, LLC to AmSouth Bank filed 7/11/06 indicating Wood Treaters granted a lien to AmSouth Bank that covered all equipment of Wood Treaters
10. Woerner Distributors, Inc. reviewed Financial Statements for years ended 12/31/04 and 05
11. Woerner Displays, Inc. reviewed Financial Statements for years ended 12/31/04 and 05

12. Unsigned Master Note for Business and Commercial Loans to AmSouth Bank from Wood Treaters, LLC for $400,000, stating at top in handwriting "Balance at 07/31/06 = 0" dated 6/30/06
13. Unsigned Note for Business and Commercial Loans to AmSouth Bank from Wood Treaters, LLC for $600,000, stating at top in handwriting "Balance at 07/31/06: 294,703.00" dated 6/30/06

14. Unsigned Note for Business and Commercial Loans to AmSouth Bank from Wood Treaters, LLC for $1,000,000, stating at top in handwriting "Balance as of 7/31/06 - $1,000,000" dated 6/30/06

The parties disagree about whether Woerner produced an unsigned copy of a Master Loan Agreement or a Security Agreement between AmSouth and several of the Woerner Entities. The parties agree that Woerner did not provide a balance sheet for himself or his businesses that included footnotes that detailed any contingent liabilities. The parties agree that no signed copies of any of the agreements entered into with AmSouth Bank were produced.

On June 30, 2006, prior to the Vision Bank $1.5 million loan to Total Vision, AmSouth Bank, Wood Treaters, LLC, Norman Woerner Management, LLC, Everstone Pavers, LLC, Woerner Distributors, Inc., and Norman and Catherine Woerner entered into a loan agreement that provided $1,000,000 to Wood Treaters, LLC in a term note and provided Wood Treaters with a $600,000 revolving line of credit, the limits of which depended on a borrowing base that was a certain percentage of Wood Treaters eligible receivables and inventory. Wood Treaters also received a $400,000 equipment loan. The AmSouth loan also involved loans to Woerner Management of $350,000 in a term note and up to $100,000 in a line of credit. Everstone Pavers had a line of credit that could not exceed $400,000. Woerner Distributors also had a revolving credit line of up to $1,550,000. The loans required that each of the parties receiving a loan and Catherine and Norman Woerner would guarantee the obligations of all of other entities involved.

Mr. Ray McCraine, the CFO of Woerner Management, testified that these loans were a refinancing of prior separate loans to the entities and were meant to bring all of the loans under one agreement. Before this loan, the entities had not cross-guaranteed each others' debts. McCraine testified that Vision Bank, at the time Total Vision was seeking a loan from it, was

aware that the other corporations named above were shopping around for loans from a single bank that would refinance and consolidate the companies' indebtedness and banking relationships. McCraine said he told Vision Bank about the search. He testified that he gave unsigned copies of the AmSouth Bank loans to Vision Bank employees, but did not recall if he gave them the Master Loan Agreement (Def. Ex. #13). He also told Braswell about the guarantees during in depth discussions with him about the various Woerner Entities. He was sure it was discussed because Vision Bank was "in contention for" the same banking arrangement as AmSouth and knew about the terms. McCraine testified Braswell knew SouthTrust was also being considered with the same cross-guarantee provisions.

Vision Bank had several loan officers that worked on the Total Vision credit during the time the corporation had loans at the Bank. During the time of the $5 million loan, Vision Bank employees Robert McKean and Brian Miller dealt with Total Vision. Sometime in 2006, Andrew Braswell became involved with Total Vision when the parties were discussing the new loan of $1.5 million and the "troubled" $5 million loan. Brian Miller was the loan officer who worked with Total Vision on the loan. He was the officer who took the loan to the loan committee at the Bank for approval. Braswell apparently did have some dealings with the Woerner parties about the loan. He was at meetings with Norman Woerner and Ray McCraine about the loan. Ray McCraine provided all of the financial information to the Bank. Norman Woerner told McCraine to give the Bank whatever it needed to process the loan request.

Upon receipt of the financial data from Total Vision, Vision Bank determined that it needed security for the loan beyond the assets of Total Vision. The video boxes "scattered all over the country" were not attractive collateral in the event of a default. Therefore, Braswell testified that the Bank looked at the other entities controlled by Woerner and determined that

Wood Treaters' cash flow was substantial and a good collateral source. It asked for a blanket lien on Wood Treaters' assets and a personal guarantee from Woerner as conditions for the making of the loan. Braswell testified that the Bank knew that AmSouth had a first lien on the equipment at Wood Treaters and a line of credit but, in reviewing the financials of Wood Treaters, concluded that the cash flow would support the Total Vision loan if needed even with the prior AmSouth loans. The Bank did have the UCC-1 filings made by AmSouth at the time of its loan to Wood Treaters, but did not ask Total Vision, through Woerner or McCraine, to produce any other documents about the liens of AmSouth. The Bank did not ask for all of the documents from the AmSouth loan or for signed copies of the loan documents. According to the Bank, Vision Bank did not learn that AmSouth had cross-guarantees from all of the listed entities until the spring of 2008. The Bank produced an email from Ray McCraine to Andrew Braswell dated 6/04/08 that indicated he dropped off at Braswell's office a copy of the "Regions (AmSouth) Cross collateralization agreement and each of the note agreements for Wood Treaters at your office at lunch today." Braswell was not the only loan officer involved in the credit, but was the only one to testify.

Norman Woerner's companies produced monthly (if not more frequent) internal balance sheets and profit and loss statements for each company. These documents were produced to Vision Bank. The internal financials are unaudited and contain no footnotes. At year end, the Woerner companies produced reviewed financials upon submission of all of their financial information to their accountants, Templeton & Company. The reviewed financials did contain footnotes. The footnotes, per accounting principles, are the place in which contingent liabilities are disclosed. The cross-guarantees of Wood Treaters, Norman Woerner Management, Everstone Pavers, and Woerner Distributors would be disclosed in the footnotes. The first

footnoted disclosure came in the reviewed financials for 2006 which were not produced until after December 31, 2006.

Norman Woerner is a high school educated, savvy businessman. He did a good job of managing his companies and hired people who had the experience he did not to handle the financial side of his businesses. Norman Woerner never prepared any balance sheets or profit and loss statements himself. He was not intimately involved in the operations of each Woerner Entity. Ray McCraine had an Accounting degree from Auburn University, an MBA in Finance, and is a certified internal auditor. He had been an employee and CFO of several companies before he was hired by Woerner. Woerner never had any concerns about McCraine's abilities. Woerner told McCraine to get all the financial information that Vision Bank needed to it and thought it had been provided. He testified that he thought a cross-guarantee and a cross-collateralization were different. He thought that what he was giving to Vision Bank was a cross-guarantee and that meant that it was not secured or collateralized. Each guarantee was unsecured. As Norman Woerner described it, "each entity supported itself, but, if a bomb went off, the other entities would step up to the plate." He only learned of the meaning of the cross-guarantees after Templeton & Company did their review in early 2007. He also knew his attorney and the Bank had negotiated for several weeks to get acceptable documents and thought all was done correctly. His personal financial statement, prepared by McCraine, included all of his debts as of 6/30/06 and he never thought of showing cross-guarantees on the document.

LAW

Due to the disagreements about what was produced by Woerner and the Woerner Entities prior to the Bank loan and what Vision Bank knew or should have known, the parties disagree about whether Woerner committed fraud and/or whether Vision Bank reasonably relied on the

documents produced or was defrauded at all. Vision Bank seeks to have its debt that Norman Woerner guaranteed excepted from Norman Woerner's discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(B). It states that a debt is not discharged if it was "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing . . . that is materially false respecting the debtor's or an insider's financial condition on which the creditor . . . reasonably relied and that the debtor . . . made with intent to deceive." Vision Bank had also claimed that Woerner's discharge should be denied entirely pursuant to 11 U.S.C. § 727(a)(4) but withdrew that claim at trial.

"Courts narrowly construe exceptions to discharge in favor of the debtor in order to give effect to the fresh start policy of the Bankruptcy Code." *Lewis v. Lowery (In re Lowery)*, 440 B.R. 914, 921 (Bankr. N.D. Ga. 2010) (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164-65 (11th Cir. 1995)). Vision Bank must prove its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). It must prove five elements: (1) that Woerner gave a written statement (2) about his or an insider's financial condition (3) that is materially false (4) on which Vision Bank reasonably relied and (5) that Woerner intended to deceive the Bank. *CIT Small Business Lending Corporation v. Diaz (In re Diaz)*, 402 B.R. 407, 422 (Bankr. M.D. Fla. 2008). The Court will discuss each issue individually.

A.

There does not appear to be a dispute that Woerner gave a written statement and his insiders, Wood Treaters, Norman Woerner Management, Woerner Distributors, and Everstone did the same. Norman and Catherine Woerner gave a personal financial statement to Vision Bank dated as of June 30, 2006. Ray McCraine gave Vision Bank a Balance Sheet and Income

Statement for Wood Treaters, LLC as of July 31, 2006, and a debt schedule for the listed entities as of an unspecified date.

It appears that the Bank also received reviewed financial statements for the listed entities for 2004 and 2005 as well. All of these are written statements about Woerner's or the Woerner Entities' finances. At trial, Braswell testified that he also believed that paragraph 3 of the Future Advance Accommodation Security Agreement between Wood Treaters and Vision Bank was a false written statement as well. Paragraph 3 reads:

> Prior Financing Statements. Grantor warrants that there is no financing statement now on file in any public office, state, local or otherwise, except such as may be duly canceled simultaneously herewith, covering the Collateral (other than such financing statements on file as of the date hereof, as may be extended from time to time, providing a security interest in the property described in item (e) of the attached Exhibit "A" in favor of AmSouth Bank for a working line of credit in the amount of $1,000,000, or as has been or may be filed in connection with this Agreement).

This is also a written statement about Woerner's insider's financial condition—Wood Treaters, LLC. Therefore, the first prong of the test is met.

B.

The writings discussed in Paragraph A are all related to Norman Woerner's financial condition or one or more of the entities he controlled. The second prong of the test is met.

C.

The third prong of the test is that the statements made in the documents, or any one document, must be materially false. According to case law, a materially false statement is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Eagle Rock Development v. Freeman (In re Freeman)*, 351 B.R. 398, 401 (Bankr. W.D. La. 2006) (quoting *Matter of Jordan*, 927 F.2d 221, 224 (5th Cir. 1991). The crux of Vision Bank's argument is

that Woerner himself, or through his employees, failed to apprise Vision Bank of secured cross-guarantees by Wood Treaters of debt of other Woerner Entities. Taking Braswell's testimony at face value, the Bank did not know of the secured cross-guarantee. Putting aside whether that was reasonable or whether Woerner meant to deceive the Bank, failure to disclose a contingent secured debt of $3.4 million of Wood Treaters did paint a substantially untruthful picture of its finances. The third prong of the test is met.

The other allegedly false document upon which Vision Bank says it relied was the Accommodation Security Agreement. In the document, Wood Treaters stated that there was no financing statement on file against Wood Treaters except one for AmSouth's working line of credit in the amount of $1 million. This statement was false because there were other UCC filings on Wood Treaters' property, at least for a $600,000 revolving credit line and a $300,000 equipment loan. The Court concludes that this statement was incorrect.

D.

The fourth prong is whether Vision Bank "reasonably relied" on the untrue statements of Woerner about Wood Treaters' financial condition. "Reasonable reliance" is not defined by the Bankruptcy Code. It "entails a 'prudent person' test." *Cashco Financial Services, Inc. v. McGee (In re McGee)*, 359 B.R. 764, 774 (B.A.P. 9th Cir. 2006) (quoting *Field v. Mans*, 516 U.S. 59, 69-71, 116 S.Ct. 437 (1995)). Reasonable reliance is "judged in light of the totality of the circumstances on a case-by-case basis." *McGee,* 359 B.R. at 774. "A determination of whether a creditor's reliance was reasonable is a factual determination." *Middlesex Savings Bank v. Flaherty (In re Flaherty)*, 335 B.R. 481 (Bankr. D. Mass. 2005). Two of the circumstances that might affect reasonableness are "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate

. . . and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id*. at 491 (quoting *Lease Corp. of Am., v Harloff (In re Harloff),* 272 B.R. 496, 500 (Bankr. M.D. Fla. 2000)). The question is threefold. First, did Woerner, through McCraine, tell someone at Vision Bank about the cross-guarantee by Wood Treaters or give the Bank a copy of the Security Agreement and, in light of that knowledge, did Vision Bank reasonably rely on the nonexistence of the cross-guarantee? Second, if the Bank was not told directly of the cross-guarantee, did Vision Bank have enough information about a possible problem that it should have investigated further? If the Bank had a duty to do further research, it did not reasonably rely on the information received from Woerner in sustaining its loss. Third, did the Bank rely on Woerner's statement in the Wood Treaters Accommodation Security Agreement that there were no other financing statements of over $1 million?

Although the evidence suggests that McCraine may have told a bank officer about the cross-guarantee of Wood Treaters, the Court concludes that Vision Bank did establish by a preponderance of the evidence that it was not given direct evidence of the Wood Treaters' cross-guarantee. Some doubt exists due to the fact that only Andrew Braswell testified for the Bank and he was not the only loan officer involved in the credit. It is possible that McCraine told Miller and not Braswell. In fact, Brian Miller presented the credit to the Loan Committee. Also, Woerner's counsel was able to establish some doubt about whether the entire Bank file was in evidence. Plaintiff's Ex. # 30 shows that McCraine gave a copy of the AmSouth cross-collateralization agreement to Braswell on 06/02/08. The document was not in Vision Bank's file at the time of trial. The email from Braswell also shows that McCraine dropped off financials for Wood Treaters for 5/31/08. Those are also not in the Bank file. Braswell does not recall if a copy of the security agreement with AmSouth was requested before the closing. It is

possible that a copy of the Security Agreement was not retained, was given to counsel or was simply not located in light of the proof that the Bank file is not complete.

The second issue is more problematic. The Bank was given copies of four UCC-1s that showed liens on the assets of Wood Treaters in favor of AmSouth Bank. The UCC-1s do not specify any amount of liability. The Bank knew that Wood Treaters and other Woerner Entities were negotiating a new consolidated banking arrangement with AmSouth. The Bank knew AmSouth was lending Wood Treaters up to $2 million. The Bank knew that the loan and UCC filings were very recent, within two months of its own closing. The Bank also had prior years footnoted, reviewed financials of Woerner's Enterprises and, therefore, the Bank knew that the interim financials it received might not contain all footnote worthy information. Braswell indicated he expected his attorneys to look into the terms of any security agreement that created the security interest evidenced by the UCC-1s that the Bank received. He believed the Bank attorneys would look at and bring it to the Bank's attention if they found anything. The Court concludes that based on these facts, a "reasonably prudent banker" would have asked to see all of the signed documents involved in the AmSouth loan and specifically asked to see the details behind the UCC filings. The Bank cannot rely on a defense that its attorney should have made the search, if necessary. Also, the Bank was on notice that the Wood Treaters' financials for July 2006 were not "final" when they lacked footnotes and the Bank had yearly footnoted financials for prior years. A reasonably prudent banker would have inquired about what any footnotes would reveal or asked for financials prepared by Templeton & Company.

The third issue is whether Vision Bank reasonably relied on the statement in paragraph 3 of the Accommodation Security Agreement signed by Wood Treaters that there was only one Financing Statement on file against it and the debt was a $1 million line of credit only. Braswell

admitted they had all of the UCC filings that were introduced into evidence at Plaintiff's Exhibits 24-28. He also stated that he helped draft paragraph 3 with the Bank's attorney and had input into putting the amount of $1,000,000 in it. He testified that he knew about the equipment loan and knew, in essence, that the paragraph was incorrect. The Bank was not relying on the equipment value for its loan to Total Vision. The critical collateral to the Bank was the more liquid items consisting of accounts receivable, cash and inventory. Braswell only focused on that collateral and he created the falsity in the document—not Woerner. The Bank did not reasonably rely on paragraph 3.

E.

The final prong of the test is whether Woerner intended to deceive Vision Bank by failing to disclose the cross-guarantees of Wood Treaters and signing the Accommodation Security Agreement with the incorrect statements in paragraph 3. Actual intent to deceive is determined by courts by looking at a number of factors. The most important is "the actual knowledge or the reckless disregard of the debtor as to the true state of his financial condition." John Spitzer, *What constitutes intent to deceive in loan or credit application under Bankruptcy Code provision concerning nondischargeability of certain debts obtained through use of false written statement respecting financial condition*, 94 A.L.R. Fed. 437 (2011). The Court concludes, after observing all of the witnesses and reading the testimony of Ray McCraine that Woerner neither intended to deceive Vision Bank nor acted with reckless disregard in his dealings with them. He instructed his Chief Financial Officer to give the Bank all of the documentation it needed. Woerner disclosed all of his debts. He had never had to deal with guarantee obligations on his financial statements before and was unfamiliar with the accounting for them. He honestly believed cross-guarantees were different from cross-collateralizations and

misunderstood the way cross-guarantees needed to be listed on a financial statement. He trusted and relied upon his CFO to provide him with the documentation the Bank needed. Finally, he had an attorney who represented him at the closing and looked over the documents and that contributed to his belief that everything was disclosed appropriately. Woerner disclosed documents that, if examined closely and questioned, did disclose the guarantees. If he had intended to hide the guarantees, he would not have disclosed the UCC-1 filings.

The Court found Norman Woerner to be credible. He was wrong in his belief but the Court concludes he testified truthfully. The Court only had Ray McCraine's deposition to read and did not see him testify, but his testimony appeared to be truthful. He was not coached about the issues before the deposition and did not try to evade any questions.

## CONCLUSION

The Court concludes that two of the five prongs of the test for determining a debt to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) have not been proved. Vision Bank did not establish by a preponderance of the evidence that the Bank reasonably relied upon the failure of Woerner to specifically disclose Wood Treaters cross-guarantee and did not reasonably rely on the statement in the Accommodation Security Agreement, paragraph 3, that the total secured debt of Wood Treaters was a $1 million revolving line of credit. Vision Bank also did not establish that Woerner acted with intent to deceive Vision Bank in his omissions from Wood Treaters' disclosures. Therefore, the Court must deny Vision Bank's request for a determination that Woerner's debt to it under his loan guarantee is nondischargeable.

IT IS ORDERED that the complaint of plaintiff, Vision Bank, against defendant, Norman L. Woerner, is due to be DENIED.

Dated: February 7, 2011

*Margaret A. Mahoney*
MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE